## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**PRESTIGE FLORIDA PROPERTY
INVESTMENT LLC,**

Plaintiff,                                    **Case No.:** 6:26-cv-00392-GAP-RMN

v.

**GOLIATH VENTURES, INC.,** a Florida
Corporation, et al.

Defendants.

_____/

## <u>VERIFIED EMERGENCY MOTION FOR IMMEDIATE</u>
## <u>APPOINTMENT OF RECEIVER AND MEMORANDUM OF LAW</u>

Plaintiff, Prestige Florida Property Investment LLC ("Prestige" or
"Plaintiff"), by and through its undersigned counsel, files this Verified
Emergency Motion for Immediate Appointment of Receiver and Memorandum
of Law (this "Motion") seeking the immediate appointment of a federal
receiver, pursuant to Fed. R. Civ. P. 66, 28 U.S.C. § 754, and the authorities cited
below, over Defendants Goliath Ventures, Inc. (Florida), Goliath Ventures, Inc.
(Wyoming) (collectively "Goliath") and Christopher Delgado ("Delgado")
(together, "Defendants"), their assets, digital wallets, cryptocurrency assets,
properties, facilities, accounts, and books and records, and in support
respectfully state as follows.

I.    STATEMENT OF NEED FOR EMERGENCY CONSIDERATION AS REQUIRED BY LOCAL RULE 3.01(F)

1.    For the reasons set forth below, Plaintiff respectfully requests this Court's emergency consideration and the immediate granting of this Motion to avoid the imminent risk of concealment, dissipation, loss, or diversion of Defendants' assets, digital wallets, cryptocurrency assets, properties, facilities, accounts that may be used to satisfy Plaintiff's claims.

2.    This action arises from a massive cryptocurrency Ponzi scheme orchestrated by Delgado, Goliath, and its other principals. Masquerading as a "Joint Venture" to evade federal and state securities registration requirements, Defendants solicited millions of dollars from investors, including Plaintiff, by promising "guaranteed" monthly returns of 4% (48% annually), or more, generated through purported cryptocurrency "liquidity pools."

3.    Based on Defendants' false representations, agreements executed under false pretenses, and fabricated claims, Plaintiff invested $1,300,000 with Goliath (the "Principal investment"). After successfully withdrawing $600,000 from Goliath Plaintiff retained a balance of $700,000 with Goliath (the "Remaining Principal").

4.    In November 2025 Plaintiff demanded return of the Remaining Principal from Defendants. Pursuant to the operative agreement between Plaintiff and Goliath, Goliath guaranteed the return of an investment in a timely manner upon Plaintiff's request.

2

5. Rather than returning Plaintiff's Remaining Principal upon demand, as agreed, Defendants have misappropriated Plaintiff's funds, and no amount of the Remaining Principal has been returned.

6. As of early 2026, the facade completely collapsed. On January 19, 2026, Defendant Clayman issued a letter admitting that Goliath's "institutional wallets have been restricted... citing violations of policy."

7. Plaintiff has learned that Defendants, rather than operating a legitimate cryptocurrency "liquidity pool" enterprise as represented, were instead operating a vast Ponzi scheme and have diverted most if not all of Plaintiff's Remaining Principal. The operative agreements executed by Defendants were little more than vehicle for massive fraud perpetrated by Defendants on Plaintiff and others. The aggregate loss is estimated to be no less than $300 million.

8. On February 24, 2026, in case number 6:26-mj-1240, the government unsealed a criminal complaint against Goliath's CEO, Delgado, and charged him money laundering, in violation of 18 U.S.C. § 1957, and wire fraud, in violation of 18 U.S.C. § 1343 (the "Complaint").[1] Dkt. 1. The Complaint details the fraudulent nature of Goliath, and how the Defendants perpetrated this Ponzi scheme on the Plaintiff and other similarly situated people.

---

[1] A copy of the Complaint is attached as Exhibit A.

9.      As a condition of release after Delgado's arrest on the Complaint, the Court entered an Order Setting Conditions of Release, dkt. 13, which required Delgado to "repatriate funds from accounts in Dubai and to turn over certain funds (fiat currency and/or cryptocurrency), jewelry, vehicles and other tangible assets to the Unites States."[2]

10.      On March 2, 2026, the government filed a Motion for Addendum to Appearance Bond, dkt. 22, and listed several assets Delgado directly controlled and that Delgado indirectly controlled through Goliath[3]. The government seeks these assets to forfeit those assets to the government.[4] Only the U.S. Attorney General can designate forfeited assets for restitution and there is no guarantee that the U.S. Attorney General may do so. *See United States v. Joseph*, 743 F.3d 1350, 1355 (11th Cir. 2014) ("The plain language of [the forfeiture statutes] also makes clear that the Attorney General alone has discretion to determine whether to retain forfeited property or apply it toward the restitution owed to the victims of a defendant's offense.").

11.      The Complaint confirmed the existence of other co-conspirators to this Ponzi scheme and that Delgado moved funds outside of Florida and the

---

[2] The Order Setting Conditions of Release is attached as Exhibit B.
[3] The Motion for Addendum to Appearance Bond is attached as Exhibit C.
[4] On March 3, 2026, the Honorable Leslie Hoffman Price entered an order directing the government to be prepared at a hearing to "discuss, with citation to relevant legal authority, how Defendant's conditions of release can include what amounts to pre-indictment forfeiture of extensive assets, and how the undersigned has the authority to impose such conditions."

12.     United States. The unsealing of the Complaint alters the incentives and motivations of those unnamed co-conspirators and Plaintiff reasonably believes that, in the absence of an immediate appointment of a receiver, Goliath under the direction and control of Delgado and his co-conspirators will (i) divert, dissipate, and conceal funds and assets from Plaintiff and this Court, and (ii) move such funds and assets beyond this Court's jurisdiction to avoid satisfying Plaintiff's claims and the claims of other similarly situated creditors, which is in excess of $300 million.

13.     Given the Complaint confirmed existence of digital wallets and the ease with which cryptocurrency can be dissipated globally in seconds, only the emergency appointment of a federal receiver with specialized digital forensics and tracing experience will adequately safeguard the rights of Plaintiff and others similarly situated.

14.     The Plaintiff's Original Complaint (the "Complaint"), this Motion, and the Verification of Alex Reece, attached to this Motion, articulate Defendants massive fraud and complete disregard of their contractual obligations to Plaintiff. Plaintiffs are now aware of others similarly situated with claims in excess of $300 million, some of whom may likely join in this request for receivership relief. Given the unsealing of the Complaint against Delgado, the size and scope of the fraud, the number of affected victims, and the likelihood that Defendants will seek to hinder any efforts to recover the misappropriated funds or collect on any judgment for same, only the

emergency appointment of a receiver will adequately safeguard the rights of Plaintiffs and others similarly situated.

15.    Immediate appointment of a receiver is necessary to: (i) confirm what assets Defendants' previously had and currently have; (ii) confirm what the Defendants' creditors are currently owed; (iii) freeze assets to ensure those assets are available for Defendants' creditors; (iv) marshal, safeguard, and liquidate assets; (v) ensure that preferential payments to related creditors and insiders do not occur at the expense of other creditors; (vi) ensure that the Defendants' creditors are repaid in a fair and equitable manner; and (vii) file any necessary or appropriate ancillary actions to recover monies or assets for the benefit of the Defendants' creditors.

16.    Plaintiffs respectfully and urgently request that the Court consider this Motion on an emergency basis and enter an Order within 5 days appointing Temporary Receiver for Defendants, including their assets, facilities, properties, insurance, books and records and other items as described below and in the proposed Order Immediately Appointing Receiver submitted herewith.

17.    The Circuit Court for the Seventh Judicial Circuit in and for Broward County, Florida, in *Patel v. Goliath Ventures, Inc.*, case number CACE-26-003310, granted a motion filed on February 27, 2026, in a breach of contract action against Goliath appointing a receiver. Notably, the *Patel* case contains a solitary breach of contract claim against Goliath Ventures, Inc. (Wyoming). As

the government has made it clear in their filings that Goliath was in large part nothing more than a conduit to move assets to Delgado personally, a receivership of Goliath standing alone is unlikely to do much to preserve purloined funds for the victims of Defendants' scheme. Furthermore, the nationwide authority granted to a federally appointed receiver is imperative to secure Defendants' assets, particularly with one Defendant being a Wyoming resident.

## II.    MEMORANDUM OF LAW

Plaintiff submits this memorandum of law in support of its request for the immediate appointment of a Temporary Receiver over Defendants Goliath and Delgado. The federal criminal complaint charging Delgado with money laundering and wire fraud demonstrates how Defendants structured this fraud upon Plaintiff and countless other victims so that Delgado could siphon out millions of dollars to fund a lavish lifestyle of luxury homes, vehicles, jewelry and other assets both inside and outside the United States. This revelation underscores the critical need for a court-appointed fiduciary to secure what remains of the estimated $300 million in victim funds before they are further dissipated.

The appointment of a Temporary Receiver is the only viable mechanism to navigate the unique challenges of this case, namely the global mobility of cryptocurrency and the existence of "private keys" currently under the sole control of the Defendants. By installing a Temporary Receiver with specialized

7

digital forensics expertise, the Court can ensure that assets are identified, frozen, and eventually distributed in a transparent and equitable manner, rather than allowing them to be lost to further concealment or used for preferential payments to Defendants and unnamed co-conspirators.

### A. <u>Governing Legal Standards</u>

As set forth in the Complaint this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78(aa), Rule 10b-5 promulgated thereunder, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a). Accordingly, this Court has the inherent equitable power to appoint a receiver. *See United States v. Bartle*, 159 F. App'x 723, 725 (7th Cir 2005); *SEC v. Levine*, 671 F. Supp. 2d 14, 36 (D.D.C. 2009). ("[R]eceiverships are and have for years been a familiar equitable mechanism. They are commonly a vehicle for court supervision of distressed businesses but have not been limited to that role." *Morgan v. McDonough*, 540 F.2d 527,533 (1st Cir. 1976); *see also S.E.C. v. Levine*, 671 F. Supp. 2d 14, 36 (D.D.C. 2009) ("Receivers are appointed so that they may take charge of a company to enforce compliance with regulatory laws.") (citations omitted).

Under 28 U.S.C. § 754, a "receiver appointed in any civil action involving property, real, personal or mixed, situated in different districts shall… be vested with complete jurisdiction and control of all such property with the right to take possession thereof." Accordingly, a receiver appointed in this action would

8

have complete federal statutory jurisdiction over the Defendants, their assets, properties, facilities, insurance, accounts, and books and records, located both in this district and elsewhere as they may be identified and located. *See Crawford v. Silette*, 608 F.3d, 275, 278 (5th Cir. 2010) (stating that "federal law creates subject matter jurisdiction for federal receivers" and noting that lawsuits brought by receivers are not subject to traditional jurisdictional requirements because they are brought pursuant to the court's ancillary jurisdiction); *Janvey v. Reeves-Stanford*, No. 3:09-CV-2151-N, 2010 U.S. Dist. LEXIS 145764, at *9 (N.D. Tex. Nov. 18, 2010) (stating that "the location of the property sought by the Receiver has no bearing on standing" because 28 U.S.C. § 754 provides a receiver with complete jurisdiction over all property situated in different districts).

In sum, this Court is best suited to adjudicate this case and has the authority to appoint a receiver over Defendants and all of Defendants' assets, properties, facilities, insurance, accounts, and books and records, wherever they may be located in the United States or elsewhere, and this Court is the most appropriate federal forum to hear this emergency Motion because Defendants' own assets and properties in, and operate out of, the Middle District of Florida.

### B. <u>Federal Receivership Standards</u>

It is well established in the Eleventh Circuit that "[f]ederal law governs the appointment of a receiver by a federal court exercising diversity

jurisdiction." *Sterling v. Stewart*, 158 F.3d 1199, 1201 (11th Cir. 1998) (citing *Nat'l P'ship Inv. Corp. v. Nat'l Housing Dev. Corp.*, 153 F.3d 1289, 1291-92 (11th Cir.1998)). Fed. R. Civ. P. 66, states that "[t]hese rules govern an action in which the appointment of a receiver is sought, or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule." Accordingly, the federal common law relating to receiverships is applied for such matters and, therefore, state law has no relevance. *JP Morgan Chase Bank, N.A. v. Heritage Nursing Care, Inc.*, No. 06 C 4803, 2007 WL 2608827 at *7 (N.D. Ill. 2007). The federal standard for the appointment of a receiver may be less stringent than state law. *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291.

Although Fed. R. Civ. P. 66 does not establish specific guidelines, Florida's federal courts consider the following circumstances relevant in connection with a motion for receiver: (1) whether the party seeking the appointment has a valid claim; (2) the probability that fraudulent conduct has occurred or will occur to frustrate that claim; (3) whether there is an imminent danger that the property will be concealed, lost, or diminished in value; (4) the inadequacy of legal remedies; (5) the lack of a less drastic equitable remedy; and (6) the likelihood that appointing the receiver will do more good than harm. *Calliope Cap. Corp. v. Earthfirst Techs., Inc.*, 8:08-CV-219-T-17TBM, 2008 WL1995077 at *2 (M.D. Fla, 2008); *PNC Bank v. Shan Motel Co.*, 6:13-cv-926-Orl-

(M.D. Fla 2014.) ECF No 77 *4 (Order appointed Receiver) (both citing *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241-42 (5th Cir. 1997)).[5]

"[A] district court has authority to place into receivership assets in litigation 'to preserve and protect the property pending its final disposition.'" *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (citing *Gordon v. Washington*, 295 U.S. 30, 37 (1935)). The appointment of receiver is warranted "where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Netsphere*, 703 F.3d at 305 (internal quotations omitted).

III.   <u>SUMMARY OF ALLEGATIONS</u>

These claims arise from Defendants' scheme to defraud Plaintiff by inducing Plaintiff to enter into a "Joint Venture Agreement," which was in economic reality an unregistered security, to fund purported cryptocurrency liquidity pools.

Based on Defendants' false representations, agreements executed under false pretenses, and promises of personal guaranties from Delgado and other co-conspirators to Plaintiff, Plaintiff provided hundreds of thousands of dollars to Defendants in the manner described below and explained in detail in the Plaintiff's Complaint. Consistent with allegations and charges in the

---

[5] An evidentiary hearing is not required on a motion for appointment of receiver where the record discloses sufficient facts to warrant such appointment. *Calliope Cap.*, 2008 WL 1995077 at *3 citing to *Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1189 (11th Cir. 1991).

Complaint, Defendants were not engaged in legitimate investments into cryptocurrency liquidity pools. Instead, Defendants were engaged in a Ponzi scheme by which Defendants enriched themselves through the investments made by Plaintiff, and others, and used Plaintiff's investment to funnel funds to themselves, or to pay guaranteed monthly returns to prior investors to maintain the façade of legitimacy and to continue to attract subsequent deposits.

Defendants guaranteed investors a high monthly return under various different "joint venture" agreements. To be able to pay these high monthly returns, Defendants represented that received funds would be used to leverage liquidity pools to facilitate passive income generation. The following is a representation of Goliath's investment cycle that was presented to investors through marketing materials.



Under the operative agreements, Goliath was obligated to return the Plaintiff's invested principle upon Plaintiff's written request. Despite this promise, in November 2025, Defendants suspended all distributions. Plaintiff immediately requested return of his Remaining Principal in accordance with its agreement with Goliath, but Defendants have not returned any further funds to Plaintiff.

### IV.    RELEVANT BACKGROUND FACTS

In or around November 2024, Defendant Jonathan Mason solicited Plaintiff to invest in Goliath. Mason represented that Goliath used "liquidity pools" in Bitcoin, Ethereum, and USDC cryptocurrencies to generate high-yield returns.

During Mason's efforts to solicit Plaintiff's investment in Goliath he provided information about the operations of the company and those involved with its management, including company legal counsel Eric Clayman, and went on to personally introduce Plaintiff to Delgado.

In conversations with Mason and Delgado in advance of investing in Goliath, Mason told Plaintiff that Goliath was a great success promising "guaranteed" monthly returns of 4% (48% annually). Defendant Delgado further promised that any principal invested was insured through Fidelity. Delgado knew that these statements were false and made them with the intention of inducing Plaintiff to invest with Goliath.

On November 21, 2024, Plaintiff entered into a "Joint Venture Agreement" (the "Agreement") with Goliath.[6] Clause 6.1.1 of the Agreement explicitly stated: "The Partner shall be entitled to the following guaranteed monthly profits... Partners will receive a 4% monthly distribution rate from their liquidity account value." Lulled by initial "profit" payments, Plaintiff invested a total of $1,300,000.

Goliath never had a mechanism or investment in place to provide the guaranteed 4% return and never had insurance, through Fidelity or otherwise, that insured the principal invested with Defendants.

In August 2025, to allay growing investor concerns, Goliath distributed an "Independent Evaluation Report" dated August 13, 2025, authored by defendant Black Block Management Services LLC (the "BlackBlock Report").[7]

The Report falsely claimed that Goliath "maintained an average collected balance of 115% or more of partner balances" and held "a sufficient position in reserves to satisfy any and all partner requests for withdrawal." Upon information and belief, defendant Black Block Management Services LLC is not a licensed independent public accounting firm, and the report was a fabrication designed to induce investors to maintain or increase their positions.

In September 2025, Plaintiff requested a withdrawal of $600,000. Defendants delayed payment, eventually remitting the sum on October 16,

---

[6] A true and correct copy of the Agreement is attached hereto as Exhibit D.
[7] A true and correct copy of the BlackBlock Report is attached hereto as Exhibit E.

2025. Plaintiff retained a balance of approximately $700,000 with Goliath.

In November 2025, Goliath suspended all distributions.

On November 14, 2025, Plaintiff demanded the return of its remaining $700,000 principal. In response, Defendants fabricated a series of excuses, ranging from "audit-driven recommendations" to pending money service business applications.

On November 17, 2025, Delgado sent a mass email blaming the suspension on "audit-driven recommendations" and promised distributions would resume shortly.[8]

On January 19, 2026, Defendants finally admitted that they had failed to secure an MSB and that their institutional cryptocurrency wallets had been frozen or restricted for policy violations.

On December 25, 2025, Defendant Delgado emailed Plaintiff stating that Goliath was setting up a "Money Services Business" ("MSB") account and that distributions were halted until January 1, 2026.[9]

On January 19, 2026, Defendant Clayman issued a formal letter to "Partners and Directors" admitting that Goliath had still not been approved for an MSB. And that "Goliath learned that its institutional wallets have been restricted. This restriction has been imposed citing violations of policy."[10]

---

[8] A true and correct copy of this November 17, 2025, email is attached hereto as Exhibit F.
[9] A true and correct copy of this December 25, 2025, email is attached hereto as Exhibit G.
[10] A true and correct copy of this January 19, 2026, email is attached hereto as Exhibit H.

As of the date of this Motion, Plaintiff's remaining principal of $700,000 has not been returned, and monthly distributions have ceased.

The criminal Complaint against Delgado underscores that nearly the entirety of the invested funds were never used for legitimate liquidity pools but were instead part of a massive, coordinated fraud. The criminal Complaint explains that based upon the government's analysis of bank records and the flow of cryptocurrency related to Goliath's known cryptocurrency wallets, through blockchain analysis, Goliath invested little, if any, investor funds in cryptocurrency investments. Only a nominal amount of investor funds were transferred to liquidity pools. Instead, Goliath used investor funds to pay phony returns to earlier investors.

The criminal Complaint explained that investors' balances and returns reflected in the Goliath accounts, as provided to investors through Goliath's online portal, were fictitious and not tied to actual investment of the funds in liquidity pools. Instead, balances were artificially manipulated to create a false appearance of constant profitability.

The criminal Complaint also revealed Delgado's use of investor funds for his own personal expenditures including cars, jewelry, lavish trips and the following real property:

a. The purchase of real property in Windermere, Florida, in September 2025 for approximately $8.5 million;

16

b.  The purchase of real property in Winter Park, Florida, in July 2025 for approximately $3.2 million;

c.  The purchase of real property in Kissimmee, Florida, in December 2024 for approximately $1.15 million; and

d.  The purchase of real property in Sanford, Florida, in August 2024 for approximately $1.65 million.

e.  A non-exhaustive list of assets bought with ill-gotten gains were described in the government's Motion for Addendum to Appearance Bond at dkt. 22 in the criminal case.

## V.   REQUEST FOR IMMEDIATE APPOINTMENT OF RECEIVER

The Eleventh Circuit applies the factors from *Santibanez*, 105 F.3d at 241-42, to determine if a receiver is necessary.

### A.   Plaintiff Has Valid Claims

Defendants made demonstrably false representations that: (i) principal investment fund would be invested in cryptocurrency liquidity pools; (ii) the principal was insured by Fidelity; (iii) the a 4% monthly return was guaranteed; (iv) investors could withdraw their principal investments at any time and the funds would be returned in a timely fashion; and (v) the enterprise held over $100 million in reserves verified by an independent audit. Plaintiff justifiably and reasonably relied upon these representations to invest $1,300,000 with Defendants.

In light of the allegations and the charged in the Complaint and the extent and nature of the vast scheme in which Defendants were engaged since at least 2023, neither Goliath nor Delgado had any intention of investing any of Plaintiff's principal investment as promised. Instead, Defendants intended to use Plaintiff's funds for their own benefit, convert them to their own use, or use the fund to pay guaranteed monthly returns to prior investors to maintain the façade of legitimacy and to continue to attract subsequent deposits.

Defendant's conduct violates section 10(b) of the Securities Exchange Act and Rule 10b-5, Section 12(a)(1) of the Securities Act of 1933, Florida Statute Section(s) 517.07 and 517.301 (Florida Securities and Investor Protection Act), and the Florida Deceptive and Unfair Trade Practices Act. Plaintiff's claims are highly likely to succeed on the merits.

**B.** **Probability That Fraudulent Activity Has Occurred or Will Occur to Frustrate Plaintiff's Claims; and Imminent Danger That Assets Will Be Concealed, Lost, or Diminished in Value**

It cannot be disputed that Defendants defrauded Plaintiff. Evidence of the Defendants' fraudulent activity is mounting daily and has been further confirmed by the criminal Complaint against Delgado.

Plaintiff, as now confirmed by the criminal Complaint, is also aware that Delgado used millions of dollars of investor funds for personal expenditures both inside and outside the United States. Because cryptocurrency transactions are pseudo-anonymous and can be transferred globally across blockchain networks instantaneously, the danger of concealment is paramount. Delgado's

18

recent arrest provides an immediate motive for Defendants and unnamed co-conspirators to divert remaining assets to unhosted cold wallets or foreign jurisdictions to avoid recovery.

**C.    Inadequacy of Legal Remedies and Lack of Less Drastic Remedies**

Based on the extent and nature of the fraud Defendants have perpetrated on Plaintiff and others, the vast network of entities affiliated with Defendants, and Defendant Delgado's affiliations and holdings in Dubai and possibly other foreign jurisdictions, Defendants have indicated a clear intent and ability to avoid and evade all obligations to Plaintiff.

Traditional legal remedies of judgment and collection will be futile. A standard freeze order is insufficient, as Defendants possess the private keys to their cryptocurrency wallets. Plaintiff's only viable remedy at this time to secure the greatest recovery for Plaintiff, and others is the immediate appointment of a receiver to take control of Defendants' assets, properties, facilities, insurance, accounts, books and records, digital assets, secure private keys, and to conduct blockchain forensics effect the orderly accounting of assets and liabilities, the liquidation of assets, the collection of receivables, the pursuit of recoveries for the benefit of all of Defendants' creditors, and the just and equitable distribution of all amounts collected or recovered.

**D.    Likelihood That Appointment of Receiver Would Do More Good Than Harm**

Defendants owe Plaintiff $700,000 for his Retained Principle and, to others similarly situated in excess of $300 million. Delgado has been charged by the government. Goliath and other unnamed co-conspirators are under criminal investigation. To the extent Defendants are operating any sort of legitimate business, the continuing operation of that business must be for the benefit of Plaintiff and other creditors.

Defendants contracted with Plaintiff to invest Plaintiff's principal in liquidity pools and to return Plaintiff's principal upon its written request. Thus, any hardship to Defendants is only to the extent of fulfilling Defendants contractual obligations they induced Plaintiff to enter into and to which Defendants became obligated thereunder. As the district court in *Calliope Capital* observed in adopting the magistrate judge's recommended order:

> In the Report and Recommendation, the Magistrate Judge recognizes that the appointment of a receiver will probably cause substantial harm to Defendants, but found that, after balancing, the appointment decision favors Plaintiff based on the negotiated agreements, The Magistrate Judge found that Plaintiff should be afforded the benefits of its bargain to avoid further harm to its financial position. These harms have been balanced, but the conclusion is adverse to Defendants. This does not mean that the balancing is incorrect.

*Calliope Capital Corp.*, at*11

### E.  Request for Appointment of Charles (Chip) Hoebeke as Receiver

Plaintiff proposes that Charles (Chip) Hoebeke, CPA, CIRA, FELLOW INSOL INTERNATIONAL, of Rehmann, be appointed as Receiver for the Defendants. Mr. Hoebeke is a highly distinguished fiduciary with over 28 years

of experience, specializing in complex cross-border insolvency matters, asset tracing, and federal equity receiverships.[11] Notably, Mr. Hoebeke's experience as a chapter 11 trustee in Wyoming has allowed him to become familiar with Wyoming law regarding fraudulent transfers, which makes him uniquely qualified for this position in light of the fact that Goliath is currently a Wyoming company.

Crucially, the tracking and recovery of cryptocurrency requires highly specialized experience. Mr. Hoebeke's team includes Chuck Story and Bill Edwards. Mr. Story is a former FBI Special Agent with 20 years of experience leading complex financial, cybercrime, and international investigations.[12] Mr. Edwards is a 29-year veteran of the FBI specializing in forensic accounting and complex white-collar crime.[13] This specialized team possesses the precise digital forensics and asset tracing expertise required to locate and secure assets, both domestically and internationally, before they can be further dissipated.

Plaintiffs request entry of the Receivership Order submitted herewith to provide the Receiver with all powers, rights, duties, and obligations as set forth therein.

Considering the extent and nature of the fraud, the lack of harm to the Defendants, and the extensive debts Defendants owe to Plaintiff, Plaintiff

---

[11] A true and correct copy of Charles "Chip" Hoebeke's CV is attached hereto as **Exhibit I.**
[12] A true and correct copy of Chuck Story's CV is attached hereto as **Exhibit J.**
[13] A true and correct copy of Bill Edwards CV is attached hereto as **Exhibit K.**

respectfully request that the appointment of the Receiver sought herein be granted without the requirement for a bond by Plaintiff or the Receiver. Alternatively, Plaintiff request a nominal bond not to exceed $500 in the aggregate for Plaintiff and/or the Receiver.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter an Order Immediately Appointing Receiver, appointing Charles (Chip) Hoebeke as equity receiver over Defendants, including their cryptocurrency wallets, assets, properties, facilities, accounts, and books and records, without the requirement for a bond (or a nominal bond not to exceed $500), and grant unto Plaintiff any and all such other relief to which they may be justly entitled.

Dated: March 4, 2026

Respectfully Submitted,

**Vincent A. Citro, Esq.**
Florida Bar No. 468657
Primary Email: vcitro@losey.law
Secondary Email: docketing@losey.law
**David A. Meek II, Esq.**
Florida Bar No. 59314
Primary Email: dmeek@losey.law
**Alfredo R. Zamora, Esq.**
Florida Bar No. 87799
Primary Email: vcitro@losey.law
Secondary Email: docketing@losey.law
**Losey PLLC**
1420 Edgewater Dr.
Orlando, FL 32804
Telephone: (407) 491-4842
*Attorneys for Plaintiff*

## VERIFICATION

Under the penalty of perjury, I Alex Reece, on behalf of Prestige Florida Property Investment LLC declare that I have read the foregoing Verified Emergency Motion to Appoint a Temporary Receiver and that the facts in paragraphs 1- 13 are true and correct based on my personal knowledge

      Dated: March 4, 2026



Alex Reece

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 04, 2026, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system, which will send a

notice of electronic filing to all parties on the Court's Service List.


      Respectfully Submitted,

**Vincent A. Citro**
Florida Bar No. 468657
Primary Email: vcitro@losey.law
Secondary Email: docketing@losey.law
**Losey PLLC**
1420 Edgewater Dr.
Orlando, Florida 32804
Telephone: (407) 205-8456
*Attorney for Plaintiff*